# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ALLOC, INC., a Delaware corporation,**
**BERRY FINANCE N.V., a Belgian corporation, and**
**VÄLINGE INNOVATION AB (f/k/a VÄLINGE**
**ALUMINUM AB), a Swedish corporation,**

                **Plaintiffs-Counterclaim Defendants,**

                                                   **Case No. 00-C-999**

        **-vs-**

**PERGO, L.L.C., a Delaware limited liability company,**

                **Defendant-Counterclaimant.**

---

# DECISION AND ORDER

---

       Four motions for summary judgment filed by Defendant Pergo, L.L.C. ("Pergo") in this patent infringement action, and a motion of Alloc, Inc., ("Alloc, Inc.") Berry Finance N.V. ("Berry"), and Välinge Innovation AB ("Välinge") (collectively "Alloc") to preclude Pergo's invalidity defenses and for partial summary judgment of no invalidity due to indefiniteness or sufficient written description of United States Reissued Patent No. 39,439 (the RE '439 patent); United States Patent Nos. 5,860,267 (the '267 patent), 6,023,907 (the '907 patent), 6,182,410 (the '410 patent), 6,516,579 (the '579 patent) (collectively the "patents-in-suit"), are pending in this action. The Court begins with Pergo's motion for summary judgment dismissing Alloc's infringement claims on the ground that based on lack of play, Alloc cannot prove infringement against the accused products.

# SUMMARY JUDGMENT - LACK OF PLAY

Pergo seeks summary judgment dismissing Alloc's infringement claims against it on the ground that based on the lack of play Alloc cannot prove infringement - either literally or under the doctrine of equivalents. The focus of Pergo's motion is on the work done by Alloc's technical expert, Robert Rice, Ph.D. ("Rice"), as well as rulings in prior administrative and judicial actions.

## Summary judgment standard

When considering a motion for summary judgment, summary judgment "will be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *See Anderson*, 477 U.S. at 255.

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See id.* at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the

evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"In rendering a decision on a motion for summary judgment, a court must 'view the evidence presented through the prism of the substantive evidentiary burden' that would inhere at trial." *Monarch Knitting Mach. Corp. v. Sulzer Morat Gmbh*, 139 F.3d 877, 880 (Fed.Cir. 1998) (quoting *Anderson*, 477 U.S. at 254). Infringement, whether literal or under the doctrine of equivalence, must be proven by the preponderance of the evidence. *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328 (Fed. Cir. 2007); *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*,418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005). Proof by a preponderance of the evidence "simply requires proving that infringement was more likely than not to have occurred." *Warner-Lambert Co.*,418 F.3d at 1341 n.15.

### Relevant Facts[1]

Alloc, Inc. is a Delaware corporation, headquartered in Racine, Wisconsin. Berry is a Belgian corporation, headquartered in Oostrozebeke, Belgium. Välinge is a Swedish corporation, headquartered in Viken, Sweden. From 2000 through June 2006, Berry held an exclusive license to the patents-in-suit, and Alloc held an exclusive sublicense to the patents-in-suit.

Pergo is a Delaware limited liability company with its principal place of business in Raleigh, North Carolina. Pergo is the successor-in-interest to Pergo, Inc., which was a

---

[1]The relevant facts are based upon Pergo's proposed findings of fact in support of its summary judgment motion of non-infringement based on lack of play and Alloc's additional factual propositions in opposition to the motion to the extent they are undisputed. Citations to quoted excerpts have been included even when the facts are undisputed.

Delaware corporation headquartered in North Carolina before it was converted into a limited liability company. Pergo markets, sells, and distributes mechanically locking laminate flooring products in stores throughout the United States, including Wisconsin.

*The Asserted Patents and Claims*

The '621 patent was issued on January 13, 1998, to Välinge. The '621 patent was first asserted against Pergo in this case in Alloc's Third Amended Complaint, filed on August 17, 2006.

The '267 patent is wholly owned by Välinge, and issued on January 19, 1999. The '267 patent was first asserted against Pergo in this case in Alloc's First Amended Complaint, filed on August 15, 2000.

The '907 patent is wholly owned by Välinge, and issued on February 15, 2000. The '907 patent was first asserted against Pergo in this case in Alloc's First Amended Complaint, filed on August 15, 2000.

The '410 patent is wholly owned by Välinge, and issued on February 6, 2001. The '410 patent was first asserted against Pergo in this case in Alloc's Second Amended Complaint, filed on September 23, 2004.

The '579 patent is wholly owned by Välinge, and issued on February 11, 2003. The '579 patent was first asserted against Pergo in this case in Alloc's Second Amended Complaint, filed on September 23, 2004.

The RE '439 patent is wholly owned by Välinge, and was reissued on December 26, 2006. The '439 patent was first asserted against Pergo in this case in Alloc's Fourth Amended Complaint, filed on February 15, 2007.

Alloc has asserted the following claims against Pergo: claim 21 of the '439 patent; claims 1, 3, and 4 of the '267 patent; claims 1, 3, and 4 of the '907 patent; claims 39, 40, 41, 44, 48, and 49 of the '410 patent; and claims 10 through 14, 22, 23, 26, and 27 of the '579 patent.

Pergo's sale of product with the Uniclic profile began in about August of 2000. In August 2001, Pergo began selling products with "SmartLock" joint profiles. There are a number of different mechanically locking joint profiles that Pergo generally refers to as "SmartLock." In addition to the Presto product with the Uniclic joint, Alloc has accused the following 23 products (each with some version of a SmartLock joint) of infringing the asserted claims: White Box Click, Casual Living, World Traveler, Abbey Excl Clic, Vintage Home, Pergo Natural, Accolade, Accolade Tile on Plank, Lowe's Promo Plank, Signature, Everyday, Presto with Smartlock, Select Click, Vintage Home Traditional Strip, Select Traditional Strip, Select Textures, Sam's Club Laminate, Accolade with Underlayment, American Cottage, Global Passage, Prodigy, Ceramic Tile Plank, and "Other Labels." The accused products were sold commercially through The Home Depot, Lowe's, Sam's Club, and/or specialty retailers. Roughly half of the accused sales are of Pergo's Presto product

with the Uniclic joint profile. The remaining quarter of a billion square feet of accused sales were of sub-brands with different joint profiles, collectively referred to under the umbrella category of "SmartLock."

Pergo's panels are sold in three different thicknesses: 7 mm, 8 mm, and 10 mm. Two accused products are 7 mm: White Box Click and Everyday. Four accused products are 10 mm: Vintage Home, Vintage Home Traditional Strip, Select Click, and Select Textures. The remaining accused products are all 8 mm.

Before a joint is milled, Pergo's engineers typically create a profile drawing, which is most often used by tooling manufacturers to make the cutting elements necessary to create the joint. Seventeen different profiles were used to create tooling for manufacturing the twenty-three accused SmartLock products.

*Prior Decisions Related to Present Dispute*

Alloc's First Amended Complaint was filed against both Unilin and Pergo on August 16, 2000, alleging infringement of the '267 patent and the '907 patent by "the UNICLIC product." In December of 2000, Alloc filed a Complaint in the International Trade Commission, asserting identical infringement claims against the UNICLIC product; i.e., Pergo's Presto product, *In re Certain Flooring Products*, Inv. No. 337-TA-443 (I.T.C.) ("the ITC action").

In the ITC proceeding, Administrative Law Judge ("ALJ") Paul A. Luckern ("Luckern") held an evidentiary hearing on July 26 through August 1, 2001, and heard closing arguments on October 16, 2001. In a 195-page decision dated November 2, 2001, the ALJ

rejected Alloc's infringement contentions, concluding that Pergo's Presto product with the Uniclic joint profile did not directly or indirectly infringe the '267 patent, the '907 patent, or the '410 patent. On March 22, 2002, the ITC Commission affirmed the ALJ's non-infringement decision. On appeal, the Federal Circuit affirmed both the ITC's claim construction and its finding that Pergo did not infringe either the asserted method claims or the asserted apparatus claims, either directly or indirectly. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003). The *Alloc* court construed "play" as being "space between the locking groove on a first panel and a locking element on a panel adjacent to the first panel." *Id*. at 1367. The *Alloc* court found substantial evidence to support the ALJ's determination that each of the accused flooring systems lacked the requisite play and therefore did not literally infringe on the asserted patents. *Id*. at 1373.

## *Evidence of Infringement*

Rice, Alloc's technical expert, was presented with a list of 24 different sub-brands at his deposition in this action. Based on his analysis, Alloc is accusing all 24 sub-brands of infringement. Initially, Rice did not recognize any of the names of the accused products. He examined only three of the accused sub-brands: Presto (Uniclic), Prodigy (SmartLock), and Accolade (different version of SmartLock from Prodigy). Rice did not evaluate actual samples of the following accused products: White Box Click, Casual Living, World Traveler, Abbey Excl Clic, Vintage Home, Natural, Accolade Tile on Plank, Lowe's Promo Plank, Signature, Everyday, Presto Smartlock, Select Click, Vintage Home Traditional Strip, Select Traditional Strip, Select Textures, Sam's Club Laminate, Accolade with Underlayment,

American Cottage, Global Passage, Ceramic Tile Plank, and "Other Labels." Alloc has presented no evidence, through Rice or otherwise, of how the testing of only three products provides evidence of infringement for the remaining, untested products.

Alloc has also brought forward no evidence, through Rice or otherwise, of testing, examination, or assembly of any accused product as it is or was actually sold in the U.S. marketplace. None of Rice's panels came from a sealed, unopened box, as it would have in each and every instance of infringement alleged by Alloc. None of the panels that Rice analyzed and concluded satisfied each and every limitation of the asserted claims were purchased by Rice; all of them were shipped from Baker & McKenzie's offices in Chicago to the University of Maine. In addition, of the three different panel thicknesses that have been accused by Alloc in this case, Rice obtained and tested only 8 mm panels; none of the 7 mm or 10 mm products have been tested. Rice received no documentation describing the source of the accused panels. For the three products Rice tested, his infringement opinions are based on "very few panels of the accused product." (*See* Ex. NN at 44:14–15) Specifically, Rice estimated that he analyzed two Prodigy panels, three or four Accolade panels, and three or four Presto panels. (*See* Ex. NN at 21:18–23, 24:15–18; 25:5–10, 27:14–16.) With regard to Accolade, Rice said that he was not sure how many panels he had tested and that he would have to go back and look. With regard to Prodigy, Rice qualified his answer with the caveat that his "memory is not always good." (*See* Ex. NN at 21 & 25.)

Rice indicated that the panels that he received were damaged extensively (*See* Ex. NN at 40-41.) Sometimes the damaged panels were contained in boxes that were an amalgam of

different panel types.  (*See* Ex. NN. at 21.)  Most of the panels that Rice received had been labeled.  (*See* Ex. NN at 19.)

Rice stated that "ragged surfaces tend to obscure gaps and spaces within the joints (for example: shortside accolade 2nd mech.jpg) and create friction when displacing the panels during assembly or reassembly."  (*See* Ex. F at 6.)  He testified that "I can also suggest to you that there are places of point contact, . . . , that could occur that would greatly inhibit displacement.  But in general, when we see around the areas identified in these photos, when we see gaps, that I would conclude that play exists and displacement could exist and displacement does exist because of that."  (*See* Ex. NN at 163-64.)

Rice's testing protocol, drafted after the testing, calls for brushing the panels with a horsehair brush.  (Ex. OO at 10-12.)  Pergo's installation instructions do not include a similar instruction.  (*See* Ex. NN at 77.)  When Rice was asked to identify the spaces for play in his photographs, the only spaces that Rice could identify were not at the locations required by the Court's claim constructions.

Rice produced four photographs of the panels that were extensively damaged prior to him performing any testing: one short side of the Presto panel; two short sides of the Prodigy panel and one short side of the Accolade panel.  None of the photographs are of the long side of the panels.  None of Rice's photographs show the entire joined assembly, and the one photograph that does show the top of the panels indicates that the upper panel edges are significantly misaligned ("proud" edges).  (Ex. F at 61.)

Rice considered a "SmartLock" tooling diagram from 2000 and concluded, after analyzing this drawing at three separate points (all of which, as with the photographs discussed above, are points of contact in the actual accused products), that "space exists for play." However, Rice did no analysis at the actual point between what Rice considers the "locking element" and the "locking groove" (the point that the Court has required that there be a space). Rice analyzed a Uniclic profile drawing, but his only conclusion was that the "groove is larger than [the] tongue." (Ex. F at App. A.)

Rice has acknowledged that through repeated assembly and disassembly of the panels, the performance of the joint (and the ease of displaceability) will change, such that play can develop in a joint. Rice performed a load testing analysis (measuring the amount of force to move panels along their joined edges) on only two panels—the long sides of a Prodigy panel, and the short sides of Presto panel. In both cases, the samples were cut down from their original full length size.

Rice's samples were not acclimated in accordance with the Pergo installation instructions, which require that planks be acclimated in unopened packages. However, Rice testified that he did leave the panel in a controlled environment.

In the videos Rice produced, he did not record the display on the load cell at the time the panels begin moving, only panning the camera back at the last moment to show the amount of force necessary to keep panels moving. Rice took no notes and made no other written record of his displacement testing.

Rice's only position as to the doctrine of equivalents is that "if a space between the locking elements cannot be discerned due to the fibrous nature of the surfaces, then the equivalent of play exists because the panels can be displaced." (Ex. F at 11.)

During the prosecution of Patent Application Serial No. 08/436,224,1[2] when responding to an obviousness rejection over a prior art reference ("Trotter"), the inventor (Tony Perván) argued that "Trotter . . . does not teach or suggest a system wherein two panels, when joined together, occupy a relative position where a play exists between a locking groove and a locking surface on a locking element that is facing the joint edges." (*See* Ex. ZZ at 10.) Perván also argued that the claimed "play" enabled the panels to "slide movably with respect to each other along the direction of the joint edge," thus allowing the "short ends of the panels to be placed adjacent each other when installing the floor" and "further enabled disassembly of the floor when required." (*See* Ex. ZZ at 11.)

Trotter's system, in which spring clips were used to hold the boards "close together," to prevent pinching was thus specifically distinguished from the "play" described in the application at issue. (*Id.*) In a subsequent amendment Perván argued that although Trotter used the term "play" at Col. 4, lines 19–23, the "play" defined in the instant specification "call[s] for a different kind of play as compared to the play in Trotter," because it is in "a different location and serves a different purpose than the play disclosed in Trotter." (*Id.* at 32 n.1.)

---

[2]This application ultimately issued as the '621 patent, entered reissue/reexam proceedings, and was then reissued as the '439 patent. The '267 patent, the '907 patent, the '410 patent, and the '579 patent each claim priority to the application which issued as the '621 patent.

In the ITC action, the complainants were explicitly found to be estopped from asserting infringement based on equivalents of "play." The ITC found that during prosecution, "the inventor distinguished a prior art reference by indicating that, unlike the prior art, his invention had play, which enabled mutual displacement of panels and disassembly of the panels" and also "disavowed flooring panel structures without play because of their inability to achieve the desired result of the invention – mutual displacement and disassembly." (*See* Ex. M at 14-15.)

Rice testified as an expert in two different matters related to the accused products: The ITC action and *Alloc Inc. et al v. Norman D. Lifton Co.*, et al, Case No. 03-Civ.-4419 (PAC) (DF) (S.D.N.Y.) ("the *Norman Lifton* action"). The Unilin products that were at issue in the ITC action included the Quick-Step product, which has the licensed Uniclic joint that also appeared on Pergo's Presto product. That same Quick-Step product was also accused of infringement in this litigation.

In the *Norman Lifton* action, Rice testified that two panels with a Uniclic joint profile could not be displaced in the direction of the joined edges (which is referred to in the patents as the D3 direction) "without undue force." (*See* Ex. WW at 8–9.)[3] Although he did not quantify the amount of force that he considers to be "undue," Rice stated that he could recall nothing "in the Pervan patents that says that one would take a . . . tool of any sort other than

---

[3]This statement is based on Pergo's proposed finding of fact 77, which is disputed as not being supported by the cited exhibit XX at pages eight through nine. However, exhibit WW at the cited pages provides support for the statement and therefore, the Court has included the statement. Pergo has also cited other pages of the same incorrect exhibit for its proposed findings numbers 79-81. Since the findings are supported by the cited pages of exhibit WW, the Court has included them. Proposed finding of fact 82 has been excluded as not being supported by the cited deposition testimony in cited exhibit YY or exhibit WW. Proposed finding of fact 83 erroneously cites exhibit YY, but is supported by the cited pages of exhibit WW and therefore has been included.

the hand." (*See* Ex. WW at 66–67.)  As such, Rice stated that the use of "a hammer, tapping

block, some other tool besides a gentle hand pressure," would be a "substantial amount of

force . . ." that "certainly" could not be considered "play."  (Ex. WW at 67.)  Rice noted that

if a flooring installer has "to provide a means other than leaning with body pressure,

hammering, using a tapping block and so on or a -- or another tool, then that's undue

pressure."  (Ex. WW at 72.)  When asked to describe what he considered undue force, Rice

testified: "Q. And how much force is undue force?   A. If I have to use a tool of some sort, a

tapping block, pound it with my hand to get that to move under normal circumstances, then

that is beyond the call. That's what one does with Unilin's product, for example."  (Ex. WW

at 69.)

Darko Perván, Välinge's CEO and father of named inventor Perván, testified in a

30(b)(6) capacity that if you have to use of tapping block and a hammer and if have hammer

so hard so you really destroy the edge or even if one third or 20 percent or even down to 10

percent of the edges are destroyed because you have to knock so hard, the panel is not

"displaceable in the meaning of [the patents-in-suit]."  (Ex. YY at 65.)

Rice describes the general concept of play as involving "the ability to move or slide,

. . . without undue slop in the joint."  (Ex. NN at 127.)

*Alloc's Additional Proposed Findings of Fact*

Pergo applied for U.S. Patent U.S. 6,591,568 (the '568 patent) in September of 2000.

The '568 patent issued on July 15, 2003.  The '568 is assigned to Pergo (Europe) AB, the IP

holding company of the parent of Pergo, the Defendant in this case. The '568 patent makes

the following statements about PCT publication WO 97/47834.

> It is also known through WO 97/47834 to manufacture a joint where the floor
> boards are joined by turning or prizing it into position with the long side edge
> as a pivot point. According to this invention a traditional tongue has been
> provided with heel on the lower side. The heel has a counterpart in a recess in
> the groove of the opposite side of the floor board. The lower cheek of the
> groove will be bent away during the assembly and will then snap back when the
> floor board is in the correct position. The snap-joining parts, i.e. the tongue and
> groove, is in opposite to the invention according to WO 94/26999 above, where
> they are constituted by separate parts, seems to be manufactured monolithically
> from the core of the floor board. WO 97/47834 does also show how the tongue
> and groove with heels and recesses according to the invention is tooled by
> means of cutting machining. This invention does also have the disadvantage
> that the the best mode of joining floor boards includes longitudinal sliding for
> joining the short sides of the floor boards, which also here will require a play
> which will cause unwanted gaps between the floor boards. Dirt and moisture
> can penetrate into these gaps.

('568 patent, 1:56-2:8.)

Beginning on June 22, 2000, Pergo was licensed by Flooring Industries Ltd. to exploit

the patent rights included in U.S. Patent No. 6,006,486 (the '486 patent). The methods that

Pergo teaches in its written and video instructions for assembling Pergo's SmartLock product

do not materially differ from the methods that Pergo teaches for assembling its Presto product.

Pergo's installation videos show that its panels can be joined in one of two ways: (i) by

angling, followed by twisting, followed by angling; or (ii) by first tapping the panels to be

joined together on the short side, and then tapping the panels together on the long side.

The '834 PCT publication and the '486 patent both claim priority to the same two

Belgian applications. Pergo has consistently sold its Presto product with patent markings that

indicate that its Presto product is made under the '486 patent. Bernard Thiers ("Thiers")

inventor on the '486 patent, admitted that the Uniclic joint is designed to have "speling," which is the Flemish word for play. However, Thiers also testified that the term "speling" as used in Unilin documents refers to the "[t]he difference between the thickness of the tongue and the thickness of the groove." (Exhibit FFF to Nemec Decl. at 165:3–5.) Thiers specifically distinguished the use of the term "speling" in the Unilin documents from "play" as that term is used in the patents-in-suit. (Exhibit FFF to Nemec Decl. at 168:22–169:2; 181:7–12; 236:24–237:17; 240:17–21.)

**Analysis**

Pergo maintains all of Alloc's infringement claims should be dismissed on summary judgment because there is no evidence that any of Pergo's products have space at the required location or displaceability resulting from that space. It also contends that Alloc's technical expert predicated his analysis on a flawed interpretation of this Court's claim construction, tested only a limited subset of damaged mismatched samples of accused products provided by counsel,[4] and contradicted his earlier statements regarding the patents-in-suit and products at issue. Additionally, it maintains that Alloc has shown no reason to depart from the prior findings of administrative and judicial bodies that have uniformly found that Pergo's accused products do not have play, and therefore do not infringe on the asserted patents.

Alloc opposes the motion contending that Pergo has made artificial, contradictory, and, in some cases, "flatly ridiculous arguments" in support of its motion. (Alloc Opp'n Br.

---

[4]Pergo is critical of Rice's testing methodology because his only testing of actual products was done on damaged samples; none of the products that Rice tested were in the original, unopened packages; there is no evidence that Rice independently verified the sub-brand of any product he tested; and he did not follow Pergo's installation instructions because he added a step by brushing the panels with a horsehair brush and acclimated the panels outside of the box.

-15-

(Docket No. 289) 1.)  Alloc also asserts that there is clearly an issue of fact regarding play.

In evaluating the parties' contentions, the Court notes that patent infringement is a two-step inquiry.  First, the Court must construe the asserted claim.  *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1357 (Fed. Cir. 2005)(citing *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1266 (Fed. Cir. 2003)).  Second, the Court must determine whether the accused product or process contains each limitation of the properly construed claims, either literally or by a substantial equivalent.  *Id.*  The first step is a question of law; the second step is a question of fact.  *Id.; see also, V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005).  Therefore, summary judgment of infringement or non-infringement is appropriate "only 'when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device.'"  *V-Formation, Inc.*, 401 F.3d at 1310  (citing *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001)).

As stated in *Freedman Seating*, 420 F.3d at 1357, "[u]nder the doctrine of equivalents, 'a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.' *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (citing *Graver Tank Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605,  609 (1950))."  (parallel citations omitted). The doctrine evolved in recognition of the fact that:

> [t]he language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of

its novelty. If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be destroyed by simple acts of copying.

*Freedman Seating*, 420 F.3d at 1357-58 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002)). "However, at the same time, the doctrine of equivalents necessarily adds uncertainty to the scope of patent claims, and thereby detracts from the public-notice function of patent claims and risks deterring non-infringing and potentially innovative endeavors." *Freedman Seating*, 420 F.3d at 1358 (citing *Festo*, 535 U.S. at 727).

Freedman Seating, 420 F.3d at 1358, states that, in recognition of this risk and in an effort to strike the proper balance between protecting patentees while also providing sufficient notice to the public, various rules of law have emerged to constrain when and how the doctrine of equivalents is to be applied. One rule is the "all limitations" rule which "holds that an accused product or process is not infringing unless it contains each limitation of the claim, either literally or by an equivalent." *Id.* (citing *Warner-Jenkinson*, 520 U.S at 29; *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001)).

This principle has two primary implications for the doctrine of equivalents. *Freedman Seating*, 420 F.3d at 1358. "First, the all limitations rule requires that equivalence be assessed on a limitation-by-limitation basis, as opposed to from the perspective of the invention as a whole." *Id.* (citing *Warner-Jenkinson*, 520 U.S. at 29) Second, an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed

invention if such a finding would entirely vitiate the limitation. *Freedman Seating*, 420 F.3d at 1358.

"There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule." *Id*. at 1359. "Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Id*.

Another rule is prosecution history estoppel. As explained in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 733-34 (2002),

> [p]rosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process. Estoppel is a "rule of patent construction" that ensures that claims are interpreted by reference to those "that have been cancelled or rejected." *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-221(1940). The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes. When, however, the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent. On the contrary, "[b]y the amendment [the patentee] recognized and emphasized the difference between the two phrases[,] . . . and [t]he difference which [the patentee] thus disclaimed must be regarded as material." *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 136-137 (1942).

*Festo Corp.,* 534 U.S. at 733-34.

The patentee bears the burden of showing that the amendment does not surrender the particular equivalent in question. *Festo Corp.*, 535 U.S. at 741. The patentee must show that

at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent. *Id.*

Before turning to the issue of "play," the Court notes that 24 Pergo products are accused of infringement. Alloc has the burden of proving infringement by the preponderance of the evidence. As indicated in the relevant facts, Rice tested only three products. Alloc has not presented any evidence, through Rice or otherwise, indicating how the testing of only three products provides evidence of infringement for the remaining, untested products. Despite construing the evidence in the light most favorable to Alloc, it has presented no evidence that would provide a basis for a reasonable jury to find that Pergo's 21 untested products infringe upon the patents-in suit. As a matter of law, Alloc has failed to establish infringement of the 21 untested products. Thus, the Court dismisses Alloc's claims of infringement against the following products: White Box Click, Casual Living, World Traveler, Abbey Excl Clic, Vintage Home, Natural, Accolade Tile on Plank, Lowe's Promo Plank, Signature, Everyday, Presto Smartlock, Select Click, Vintage Home Traditional Strip, Select Traditional Strip, Select Textures, Sam's Club Laminate, Accolade with Underlayment, American Cottage, Global Passage, Ceramic Tile Plank, and "Other Labels."

With respect to the issue of play, the Court construed the term "play" to mean "space between the locking surfaces of interlocking panels such that the locking surfaces can be displaced relative to one another in the direction of their joined edges." (Docket No. 255, at 62-64, 78.) The Court also stated that "a play" must exist "between the locking element and the locking groove." (*Id.* at 76.) Thus, under the Court's construction of the claim terms,

there must be an actual space between two particular components of adjacent panels. (See id. at 76, 78.) As a further indication that the Court's construction of the term "play" requires proof of an actual space is its construction for the term "small play," which is identical to its construction for "play" except for the requirement that the "space" be "relatively little" (*Id.* at 64-66, 79.)

In addressing Alloc's evidence and arguments, the Court notes that Alloc asserts that Pergo made an admission in the '568 patent that "long side displacement requires play." (Docket No. 289 ("Alloc Opp'n Br.") at 2.) It asserts that such admission is applicable to Pergo's Presto product and its Smartlock products which are shown in Pergo's instructional videos as being displaced longitudinally. Alloc's contention is not persuasive for multiple reasons. First, this Court's construction of play is not synonymous with displacement. Second, the statement is made with respect to '568 patent; not the Unilin '486 patent which is marked on Presto boxes. It also has no apparent connection to the Smartlock products. Additionally, the statement is ambiguous – it is unclear whether "this invention" refers to Unilin's WO 97/47834 patent, or to the invention disclosed in the '568 patent. Furthermore, the statement makes no representation that the Uniclic or Smartlock products have a "space" as required by the Court's definition.

Alloc also argues that "[p]lay on the short sides of Pergo's panels are plainly shown in Pergo's installation" videos because in Alloc's view, those videos "clearly show[] easy short side displacement." (Alloc Opp'n Br. at 1-2.) However, the installation videos do not show the presence of any space between the locking element and the locking groove. The

only way that Alloc can suggest "that these videos, alone, provide a basis for denying Pergo's motion" is to equate displacement with play.  (Alloc Opp'n Br. at 2.)

Alloc also relies upon video evidence created by Rice, listed on page ten of Alloc's opposition brief.  However, none of that video evidence shows the space required under the Court's definition.  As shown by Alloc's own descriptions, these videos provide only alleged evidence of displacement, rather than any evidence of a space.  (*See* Alloc Opp'n Br. at 10; Docket No. 276, Ex. SS.)[5]

Accepting Alloc's arguments with respect to these videos would require modification of the Court's construction to eliminate the initial requirement that there be "space between the locking surfaces of interlocking panels such that. . . "  Alloc has reinterpreted the Court's definition of play to mean simply that "locking surfaces can be displaced relative to one another in the direction of their joined edges."  Alloc has ignored the first half of the Court's construction of "play."

The evidence that Alloc cites in its opposition brief addresses only the second half of the construction for "play."  This is insufficient to create a genuine issue of material fact, because the ultimate burden is on Alloc to prove by a preponderance of the evidence that each and every limitation of the asserted claims is found on the accused products – including a

---

[5]Pergo also argues that Rice's testimony about ease of displacement with light tapping should be discredited as contradicting his prior deposition testimony in the ITC action and the *Norman Lifton* action.  Pergo cites *Adleman-Tremblay v. Jewel Cos.*, 859 F.2d 517, 520-21 (7th Cir.1988); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 974-77 (4th Cir. 1990)*; Brown v. Family Dollar Stores of IN, LP,* 534 F.3d 593, 598 (7th Cir. 2008).  Only *Rohrbough*, 916 F.2d at 976, upheld the exclusion of contradictory testimony.  Moreover, none of the cases cited by Pergo involve testimony from another action(s).  Pergo has not established that the rule against creating "sham issues" is applicable to these circumstances.  *See  Patton v. MFS/Sun Life Fin. Distribs.,* 480 F.3d 478, 488 (7th Cir. 2007).  While the prior testimony might be relevant to Rice's credibility, matters of credibility are not subject to determination upon summary judgment.

space between the locking element and locking groove. *See Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1060 (Fed. Cir. 2009).

Moreover, Alloc's expert did no analysis of whether any of the accused products have a space at the particular location required by the Court. Alloc reproduces three of the photographs that Rice included with his expert report, but they are cropped in such a way that it is not possible to analyze whether there is a space between the "locking element and the locking groove." (Alloc Opp'n Br. at 9.) While Rice analyzed Pergo's profile drawings at three places (points A, B, and C), he did not analyze point D, which clearly shows that there is no space at the location required by the Court's claim construction. Alloc later argues that Pergo's installation diagrams that "illustrate the kinds of displacement that occur in installation [sic] the Pergo products" are "sufficient to show play in the Pergo product." (Alloc Opp'n Br. at 15.) However, neither diagram provides any evidence of the space between the particular locking surfaces required under the Court's definition and, thus, Alloc's proffered evidence does not create a genuine issue of fact. (*Id.*)

Rice attempts to overcome this evidentiary gap by pointing to testimony from Thiers, a Unilin employee, that certain Unilin products are tested for "vertical play." (Alloc Opp'n Br. at 8.) However, Thiers' deposition testimony establishes that the term "vertical play" refers only to "the difference between the thickness of the tongue and the thickness of the groove," and thus has nothing to do with the presence of a space as required by the Court. (Ex. FFF to Nemec Decl. at 165:3–5.) Rice implicitly acknowledges as much, in his report, when

he makes the leap from the so called presence of vertical play indicating that it indicates the presence of horizontal play.

Alloc also cites Pergo's CertainSeal challenge video as evidence that gaps may form over time. (Alloc Opp'n Br. at 8.) This evidence is likewise insufficient to create an issue of fact because any such gaps are at the surface of the panels, not at the operative location defined by the Court, and will be eliminated when seasonal environmental conditions change. (*See* Docket No. 276, Ex. Y, at ¶¶ 48–54.)

In Rice's supplemental declaration, he states only that these "micrographs clearly show spaces." (Docket No. 294, Ex. 28 ¶ 14.) However, Rice's statement provides no evidence of spaces at the required location.

The evidence produced in this case, photographic or from Pergo's internal drawings, shows that there is no space in the location required by the Court. Alloc has improperly equated play with displacement, and read out the Court's explicit and separate requirement of a "space" found "between the locking element and the locking groove." Therefore, despite construing the evidence in the light most favorable to Alloc, no reasonable jury could conclude that any evidence shows the existence of a space.

Alloc has also not presented any evidence or argument that there is infringement under the doctrine of equivalents; rather it only argues against application of prosecution history estoppel. However, its argument side steps Pergo's contention that Alloc is estopped from asserting the equivalent of "play" based on the statements which it made to distinguish the prior Trotter patent when it was prosecuting the Patent Application Serial No. 08/436,224,1.

Alloc asserts that the events in the prosecution of the original '621 patent (reissued as the '439 patent) did not include any statements or amendments that could possibly give rise to the asserted claims being subject to an estoppel. Alloc simply relies on the fact that the claims were found allowable which is not enough.

To overcome summary judgment under the doctrine of equivalence, the non-movant must present particularized evidence and linking argument as to the "insubstantiality of the differences" between the claimed invention and the accused device, or with respect to the "function, way, result" test. *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir 2005). Having failed to do so, Alloc is foreclosed from invoking the substantive application of the doctrine of equivalents. *See id.* Moreover, conclusory statements regarding equivalence do not raise any genuine issues of material fact. *See id.* Alloc has not met its burden of proof on the issue of infringement under the doctrine of equivalence. *AquaTex Indus., Inc.*, 479 F.3d at 1329. In light of the foregoing, Pergo's motion for summary judgment dismissing Alloc's infringement claims against it because the accused products lack play is granted.

In its method's non-infringement summary judgment motion brief, Pergo states that even if the Court were to conclude that there are disputed issues of fact regarding the play claim, there are at least three independent bases for granting summary judgment as to the asserted methods claims. (Docket No. 270 at 1.) Pergo also filed a motion for summary judgment based on laches and a motion for summary judgment holding that that Pergo did not willfully infringe upon any of the patents-in-suit. Alloc also filed a motion to preclude

Pergo's invalidity defenses and for partial summary judgment of no invalidity due to indefiniteness or inadequate written description. Based on the Court's disposition of Pergo's motion for non-infringement based on lack of play, which is dispositive of Alloc's claims, the Court dismisses the remaining motions as well as Alloc's claims in this action as set forth in its Fifth Amended Complaint.

Additionally, the Court grants judgment in favor of Pergo on its counterclaims of non-infringement, and in the exercise of its discretion to conserve judicial resources, dismisses without prejudice Pergo's remaining counterclaims of invalidity, inequitable conduct, and laches/estoppel. Dismissal of counterclaims of invalidity has been upheld by the Federal Circuit when non-infringement is clear and invalidity is not plainly evident. *See Phonometrics, Inc., v. N. Telecom, Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Pergo's motion for summary judgment of non-infringement based on lack of play (Docket No. 272) is **GRANTED**;

Pergo's motion for summary judgment on the grounds of laches (Docket No. 263) is **DISMISSED**;

Pergo's motion for summary judgment of no infringement of the asserted method claims (Docket No. 269) is **DISMISSED;**

Pergo's motion for summary judgment of no willful infringement (Docket No. 266) is **DISMISSED**;

Alloc's motion to preclude Pergo's invalidity defenses and for partial summary judgment of no invalidity due to indefiniteness or sufficient written description of the RE 439, '267, '907, '410 and '579 patents (Docket No. 278) is **DISMISSED**;

Alloc's claims against Pergo arising out of the RE 439, '267, '907, '410 and '579 patents are **DISMISSED WITH PREJUDICE**;

Pergo's counterclaim for non-infringement of the RE 439, '267, '907, '410 and '579 patents is **GRANTED;**

Pergo's remaining counterclaims for invalidity, inequitable conduct, and laches/estoppel are **DISMISSED WITHOUT PREJUDICE**; and

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of September, 2010.

**BY THE COURT**


*s/ Rudolph T. Randa*
**Hon. Rudolph T. Randa**
**U.S. District Judge**